# In the United States Court of Federal Claims

No. 14-541C
(Filed: May 20, 2015)

|  |  |  |
|---|---|---|
| JACINTOPORT INTERNATIONAL LLC, | ) | Contract Disputes Act ("CDA"), 41 |
|  | ) | U.S.C. § 7104; Motion for Judgment on |
| Plaintiff, | ) | the Pleadings, RCFC 12(c); Motion for |
|  | ) | Summary Judgment, RCFC 56; Contract |
| v. | ) | Interpretation; Patent Ambiguity; Latent |
|  | ) | Ambiguity; Extrinsic Evidence. |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

*James Hamilton*, Morgan, Lewis & Bockius LLP, Washington DC, attorney of record for plaintiff, with whom were *Raechel Anglin* and *Patrick Harvey*.

*Veronica Nicole Onyema*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington DC, for defendant.  With her were *Franklin E. White, Jr.*, Assistant Director; *Robert E. Kirschman, Jr.*, Director; *Benjamin C. Mizer*, Acting Assistant Attorney General; and *M. Katherine Stroker*, Deputy Assistant General Counsel, Office of the General Counsel, Litigation and Enforcement (GC/LE), U.S. Agency for International Development, Washington, DC.

## OPINION AND ORDER

This case, which presents a claim under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b)(1), is currently before the Court on plaintiff's motion for partial judgment on the pleadings and the government's cross-motion for partial summary judgment.  For the reasons set forth below, plaintiff's motion is **DENIED**, and the government's cross-motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

On August 11, 2006, the United States Agency for International Development ("USAID") posted Solicitation Number USAID-RFP-TRN-06-060 ("the solicitation"). Solicitation 1, Apr. 20, 2015, ECF No. 21-1.  The solicitation requested proposals to "provide pre-positioned packaged food storage, cargo handling, custodial and logistics services, covering food commodities for the [USAID] Title II Food Aid Program."  Solicitation 2.  Plaintiff Jacintoport International LLC ("Jacintoport"), a private port facility operator in Houston, Texas, submitted the offer that USAID ultimately accepted.  Accordingly, effective May 1, 2007, USAID and Jacintoport entered into a contract, which initially ran until April 30, 2009 but was extended several times until it ultimately terminated in October 2009.  Compl. ¶ 2, Ex. A ("Contract") at 1, 18-19.

There are two issues before the Court in this case.  The first concerns the extent to which the contract obligated the government to reimburse Jacintoport for costs it incurred to fumigate the warehouse within which the USAID commodities were stored.  According to the government, the contract provided reimbursement for the costs of fumigating the commodities themselves, but not the warehouse.  Def.'s Opp'n & Cross-Mot. 11-16, Jan. 12, 2015, ECF No. 14.

The provision of the contract that is relevant to the resolution of this issue is Section VI, specifically paragraphs A and D.  Section VI is captioned "RESPONSIBILITY FOR CONDITION OF WAREHOUSE AND PROTECTION OF COMMODITIES" and states, in pertinent part, as follows:

>  A.      The Contractor must maintain the warehouse in a sound, clean condition and in accordance with the standards in this contract, take all commercially reasonable steps to keep it free of insects, rodents, birds, and other conditions which may adversely affect the condition of the commodities or their containers, including but not limited to fumigation which shall be reimbursed by USAID.

>  B.      The Contractor must, in accordance with the standards in this contract, take all commercially reasonable steps to promptly detect any deterioration, insect infestation, rodent damage, mold, or any other condition which may adversely affect the condition of the commodities or their containers. Contractor will conduct daily inspections of cargo in the warehouse, provide ventilation as needed and order inspectors [sic] when necessary.

>  C.      If any of the conditions above are detected, the Contractor must notify USAID by telephone and confirm such notification in writing. Pending receipt of instructions from USAID, the Contractor must take all reasonable steps necessary to protect and preserve the affected commodities or their containers.

> D.    Contractor shall fumigate the commodities as necessary or as determined to be necessary by inspection. All fumigation costs shall be reimbursed by USAID and shall be billed at cost.

Contract at 7.

Also relevant to the issue of whether the contract promised reimbursement for warehouse fumigation in addition to commodity fumigation is the following paragraph, contained in the solicitation appended to the contract:

> Fumigation: If condition inspectors find infested commodities, the contractor shall arrange and pay for fumigation of any lots found to be infested . . . .  Fumigation is to be done in accordance with the FGIS fumigation handbook.  The contractor shall pay all cost associated with fumigation.  The contractor shall be reimbursed by the government for these costs on a cost reimbursable basis in accordance with the contract rates, terms and conditions.  Copies of all fumigation reports shall be sent to the USAID CTO.

Contract at 15.

The second issue before the Court concerns the rate that Jacintoport was entitled to charge for fumigation services.  Schedule B of the Contract, entitled "Schedule of Rates," states that "[u]nless otherwise provided, charges payable by USAID or commodity vendors or carriers for receipt, storage, inspection and re-delivery of commodities pursuant to this Agreement will be as follows:"

Rates for handling and storage:

1. Receiving (trucks or railcars) (Payable by Commodity Vendors):
   Floor loaded or on pallets                                          $10.00/mt

2. Storage and inspections price per metric ton per day (Payable by USAID) $0.49/mt
   10 days free time

3. Container stuffing (includes breakbulk drayage) (Payable by Carriers)      $23.00/mt
   Blocking and bracing per container, if required                      $175.00 per container

4. Drayage to all other Houston berths (Payable by Carriers)               $ 15.00/mt

5. Stevedoring (warehouse floor to vessel hold) (Payable by Carriers)
                                                      50 kg bag    up to $21.50/mt
                                                      25 kg bag    up to $23.50/mt
                                                      Veg. oil       up to $28.50/mt

6. Fumigation (at cost)                                                    $3.00/mt

7. Loading containers to vessel or barge           Loaded (up to $120.00/container)
                                                    Empty  (up to $95.00/container)

3

Contract at 11.

Jacintoport submitted two fumigation-related invoices to USAID during the term of the contract. Those invoices, which USAID paid in full, were dated October 5 and September 27, 2007. See Def.'s Opp'n & Cross-Mot. Ex. B. The total amount billed in the invoices was $10,918.65, which constituted reimbursement for the fumigation of certain lots of cargo at the cost to Jacintoport of hiring a third party vendor. See id.

Jacintoport's complaint in this case arose out of a certified claim that it filed on May 22, 2013, some three and a half years after the contract terminated.[1] Compl. Ex. B. That claim sought an additional $552,658.35 for expenses Jacintoport allegedly incurred for fumigation of its warehouse, charged at $3.00 per metric ton. Id. The contracting officer denied Jacintoport's claim on July 18, 2013. Compl. Ex. C.

The contracting officer reasoned that "our contract scope of services, and pricing, do not require (as a separate performance service) the fumigation of a warehouse." Id. Rather, according to the contracting officer, the word "fumigation" in the contract "is in reference to the commodities." Id. Furthermore, the contracting officer found that the rate that Jacintoport sought to charge for warehouse fumigation, which was based upon the quantity of commodities stored in the warehouse and set at $3.00 per metric ton, departed from the intent of the parties as well as the logistics industry standard. Id. According to the contracting officer, "[t]he government and Jacintoport had a meeting of the minds regarding the fact that commodity fumigation (not warehouse fumigation) would be budgeted at $3.00 per fumigated metric ton," but that, in practice, it "would be reimbursed by the government 'at cost.'" Id. Regarding the industry standard, the contracting officer observed that "[t]ypically, if warehouse fumigation is contemplated, a warehouse owner and a fumigator may agree on costs or prices related to warehouse area, square or cube footage, rather than the quantity of cargo stored in the warehouse," measured by metric ton. Id.

After receiving the contracting officer's decision, Jacintoport brought this action directly on the claim in this Court, pursuant to the CDA, 41 U.S.C. § 7104(b)(1). Arguing that the plain language of the contract manifests USAID's agreement to reimburse Jacintoport for the fumigation of its entire warehouse at a rate of $3.00 per metric ton, Jacintoport has moved for partial judgment on the pleadings. Pl.'s Mot. for Partial J. on the Pleadings ("Pl.'s Mot.) 1. The government, on the other hand, has cross-moved for partial summary judgment, contending that "the plain language of the contract, as well as Jacintoport's own conduct during contract performance, demonstrates that its claim lacks merit." Def.'s Opp'n & Cross-Mot. 1.

---

[1] Jacintoport filed the certified claim while it was defending against a qui tam fraud action related to other aspects of its performance of the USAID contract. See United States ex rel. Raggio v. Jacintoport Int'l, LLC, Civ. No. 1:10-cv-01908 (D.D.C.).

**DISCUSSION**

## I.      Jurisdiction

The Court has subject-matter jurisdiction to decide this case under the Tucker Act, 28 U.S.C. § 1491, and the CDA, 41 U.S.C. § 7104.  The Tucker Act grants the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act further provides that the Court "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the CDA]."  Id. at § 1491(a)(2).

Before the Court may review a claim by a contractor, the CDA requires the contractor to have (1) submitted to the contracting officer a valid claim within the meaning of FAR 2.101, certified if the amount requested is more than $100,000, and (2) received from the contracting officer a final decision on that claim.  41 U.S.C. § 7103; M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  These requirements are jurisdictional.  Id. at 1328.

Here, the government does not contest Jacintoport's assertion that it has met all jurisdictional requirements, see Joint Prelim. Status Report at 1, Oct. 17, 2014, ECF No. 6, and the Court likewise is satisfied that it possesses jurisdiction to rule on Jacintoport's claim.

## II.     Standards for Decision

### A.  Judgment on the Pleadings

Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC") permits a party, "[a]fter the pleadings are closed—but early enough not to delay trial" to move the court "to resolve the substantive merits of the controversy as disclosed on the face of the pleadings."  Crusan v. United States, 86 Fed. Cl. 415, 417 (Fed. Cl. 2009) (quoting 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2008)).  When deciding a motion for judgment on the pleadings, "the court may review 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice."  Crusan, 86 Fed. Cl. at 417 (quoting 5C Wright & Miller § 1367).  The court will grant such a motion "where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law."  Forest Labs., Inc. v. United States, 476 F.3d 877, 881 (Fed. Cir. 2007).

### B.  Summary Judgment

Like judgment on the pleadings, summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Unlike judgment on the

pleadings, however, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by," for instance, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, [or] interrogatory answers." RCFC 56(c).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255. The court must not, however, weigh the evidence or make findings of fact. See id. at 249. The court should act with caution in granting summary judgment and deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. Id. at 255.

### C.  Contract Interpretation

Contract interpretation begins with the language of the contract. Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir. 2014). Further, "[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

When the contract's "provisions are 'clear and unambiguous, they must be given their plain and ordinary meaning.'" Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (quoting Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1373 (Fed. Cir. 2001)); see also Sea-Land Serv., Inc. v. United States, 553 F.2d 651, 658 (Ct. Cl. 1977). In other words, "the court may not look to extrinsic evidence to interpret [unambiguous] provisions." TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006).

A contract is ambiguous if the "language can reasonably be interpreted in more than one way." LAI Servs. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir. 2009). If the contract is ambiguous, the court's approach to construction depends upon whether the ambiguity is patent or latent. The ambiguity is patent when it is "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start." NVT Techs., 370 F.3d at 1162. Therefore, in the case of a patent ambiguity, the court construes the contract against the contractor. On the other hand, where an ambiguity is not sufficiently glaring to trigger the duty to inquire, the ambiguity is latent. HPI/GSA 3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004). In the case of a latent ambiguity, the general rule of contra proferentem, which requires the court to construe the contract against the drafter, may apply. Id.

As the Federal Circuit has observed, however, "contra proferentem is a rule of last resort." Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1352 (Fed. Cir. 2006). "Ascertaining the most reasonable construction of contract language utilizing other tools of contract interpretation must be the first priority." Id. Thus, "before resorting to the doctrine of contra proferentem, '[the court] may appropriately look to extrinsic evidence to aid in [its] interpretation of the contract.'" Id. at 1354 (quoting Metro. Area Transit, Inc. v. Nicholson, 463 F.3d 1256, 1260 (Fed. Cir. 2006)). For example, the court may consider contemporaneous

circumstances, evidence of the parties' intent, or their course of performance.  See Pub. Serv. Co. of Okla. v. United States, 88 Fed. Cl. 250, 258 (2009).  If such evidence fails to illuminate the meaning that the parties intended, the court then may apply the doctrine of contra proferentem and rule against the government.  Gardiner, Kamya & Assocs., 467 F.3d at 1352 ("[T]he doctrine of contra proferentem is applied only when other approaches to contract interpretation have failed."); see also Alvin, Ltd. v. U.S. Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("[I]n the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.").

### III.    Application of Standards

#### A.    Cross-motions concerning whether the contract provides reimbursement for fumigation of commodities only or whether such reimbursement is provided for fumigation of the warehouse as well

The first issue presented by the parties' cross-motions is whether the contract contemplated reimbursement for Jacintoport's fumigation of its warehouse or only for fumigation of the lots of commodities.  Jacintoport, for its part, argues that the language of the contract unambiguously required it to fumigate the warehouse itself and that the contract provided that Jacintoport would be reimbursed for doing so.  Jacintoport highlights paragraph A of section VI of the contract, which appears to address Jacintoport's obligations related to the warehouse:

> [T]he Contractor must maintain the warehouse in a sound, clean condition and in accordance with the standards in this contract, take all commercially reasonable steps to keep it free of insects, rodents, birds, and other conditions which may adversely affect the condition of commodities or their containers, including but not limited to fumigation which shall be reimbursed by USAID.

Pl.'s Mot. 5 (quoting Contract at VI.A) (plaintiff's emphasis).  According to Jacintoport, paragraph A imposes obligations and a right to reimbursement with respect to the fumigation of the warehouse itself, while paragraph D of section VI deals with a separate matter—the fumigation of infested lots.  Id.  Paragraph A, Jacintoport argues, was intended to require "prophylactic fumigation" of the warehouse generally "to preserve the condition of the commodities," Pl.'s Reply & Resp. 7, 9, Feb. 12, 2015, ECF No. 17 (emphasis in original), whereas paragraph D refers to fumigation of commodities "'as necessary' where particular infested lots are identified by inspection or otherwise."  Id. at 10.  Thus, Jacintoport argues, "[t]he Contract cannot be read as requiring only the fumigation of infested commodity lots without reading Subparagraph VI.A out of the contract."  Pl.'s Mot. 6.

The government, predictably, also claims that the plain language of the contract supports its interpretation.  The government observes that the contract repeatedly refers to fumigation with respect to the commodities themselves, and not the warehouse.  Def.'s Cross-Mot. & Opp'n 12 (citing Contract at section VI.C, which requires the contractor to "take all reasonable steps necessary to protect and preserve the affected commodities or their containers" and VI.D, which requires the contractor to "fumigate the commodities as necessary"); see also id. at 13 (observing

that the reference to fumigation in section VI.A follows a specific reference to "conditions which may adversely affect the condition of the food commodities or their packages").

Further, the government observes, the paragraph in the solicitation labeled "fumigation" refers to "fumigation of any lots found to be infested" and states that "[f]umigation is to be done in accordance with the FGIS fumigation handbook." Def.'s Cross-Mot. & Opp'n 4-5, 12-14 (quoting Contract at 22). That handbook, the government correctly notes, outlines "policies and procedures for the fumigation of grain and certain commodities"; it does not purport to cover the fumigation of warehouses or warehouse structures. Id. at 13-14, Ex. A at 1-1. In fact, the government contends, Jacintoport's interpretation of the contract "runs counter to common sense," observing, among other things, that "because Jacintoport also leased its warehouse space to other entities, it is unclear how the entire structure could be fumigated so that only the areas housing USAID's various shipments of incoming and outgoing commodities would be impacted." Id. at 15.

The Court concludes that neither party has established that its reading of the contract is the only reasonable one. Indeed, both parties' interpretations are subject to doubt. For example, the gravamen of Jacintoport's argument is that the fumigation obligations imposed by section VI, paragraphs A and D cover separate situations. As noted, it argues that paragraph A provides for prophylactic fumigation of the warehouse itself to prevent infestation of the commodities, while paragraph D is intended to require fumigation of the commodities themselves where they have already become infested. The problem with this argument, however, is that it is inconsistent with the language of paragraph D, which requires the contractor to fumigate the commodities "as necessary or as determined to be necessary by inspection." Contract at 7 (emphasis added). This language indicates that fumigation of commodities may be contemplated under paragraph D for prophylactic purposes as well as for circumstances in which they have already become infested. And if that is so, then a provision affording Jacintoport reimbursement for prophylactic warehouse fumigation as well is arguably redundant. Further, Jacintoport's argument does not come to terms with the fact that the FGIS handbook incorporated into the contract covers only commodity fumigation and not warehouse fumigation, or with the government's contention that if warehouse fumigation were contemplated, then the rate of reimbursement would be based on the square footage of the warehouse, and not the quantity of the commodities.

The government's interpretation of the language of the contract is also not free from doubt. In particular, the government has not satisfactorily addressed Jacintoport's argument that paragraph A appears to set forth a separate requirement for reimbursement for fumigation as necessary to keep "the warehouse . . . free of insects, rodents, birds and other conditions which may adversely affect the condition of the commodities or their containers." Contract at 7. Thus, in its reply brief, the government asserts that "Jacintoport's general obligation to maintain its warehouse in a sound, clean condition is separate from USAID's obligation to reimburse it for commodity fumigation expenses" and that "Section VI.A does not reference reimbursement, while Section VI.D does." Def.'s Reply 3-4, Mar. 2, 2015, ECF No. 18. But contrary to the government's argument, Section VI.A does explicitly reference reimbursement for fumigation.

At this stage, the Court concludes that neither party's interpretation of the contractual language is outside the "zone of reasonableness." Metric Constructors, Inc. v. NASA, 169 F.3d

747, 751 (Fed. Cir. 1999).  The contract could reasonably be read to provide reimbursement for both prophylactic warehouse fumigation and commodity fumigation as Jacintoport would have it, given that entitlement to reimbursement appears in both paragraph A, which is addressed to warehouse conditions, and paragraph D, which concerns fumigation of the commodities themselves.  Or, as the government argues, paragraph A could be interpreted as imposing only a general obligation to take such steps as are commercially reasonable to protect the condition of the commodities, with the language referring to "fumigation which shall be reimbursed by USAID" serving as a reference to the fumigation of commodities that is specifically required under paragraph D.

Because "[a]mbiguity exists when contract language can reasonably be interpreted in more than one way," LAI Servs., 573 F.3d at 1314, the contract is ambiguous as to whether USAID committed to reimburse Jacintoport for fumigating its warehouse or whether the obligation to reimburse exists only for commodity fumigation.  This ambiguity, however, was not so "obvious, gross, or glaring" that Jacintoport had a duty to inquire about it at the start.  NVT Techs., 370 F.3d at 1162.  Rather, the ambiguity was latent.

As explained above, when the contract contains a latent ambiguity, the Court may look to extrinsic evidence to aid in its construction.  Indeed, the government has sought to rely upon such evidence in its motion for summary judgment, contending that "the course of dealings between the parties demonstrates that both understood that only commodity fumigation was reimbursable, and at cost."  Def.'s Cross-Mot. & Opp'n 18.  It has also argued that Jacintoport's reading of the contract is inconsistent with industry practice.  Id. at 20.  At this stage in the proceedings, however, no discovery has yet taken place.  Jacintoport has submitted a Rule 56(d) declaration in support of its opposition to the government's motion for summary judgment, which persuasively asserts that it needs discovery in order to respond to the government's arguments concerning, among other things, the course of dealing between the parties regarding warehouse and/or commodity fumigation.  See Pl.'s Reply & Resp. 14-15, Attachs. 1-2.

For these reasons, the Court concludes that Jacintoport's motion for partial judgment on the pleadings must be denied.  Further, the government's motion for summary judgment on the issue of whether the contract provided for reimbursement for fumigation of Jacintoport's warehouse is premature, as no discovery has yet taken place in the case.  The Court will therefore deny this portion of the government's motion, without prejudice to it refiling another motion for summary judgment once the parties have had the opportunity to engage in discovery.

## B.  Cross-motions regarding proper rate of reimbursement for costs of fumigation

In addition to arguing that the contract required USAID to reimburse it for warehouse fumigation, Jacintoport contends that "[t]he best reading of the language, 'Fumigation (at cost) $3/mt,' is that fumigation will be deemed to cost $3.00 per metric ton and will be reimbursable at that rate."  Pl.'s Mot. 4.  This interpretation makes sense, explains Jacintoport, when the contract is interpreted to require fumigation of the entire warehouse because "[t]he use of the $3.00 a metric ton cost figure was the Contract's way of allocating a fair share of [warehouse] fumigation costs to the prepositioned goods stored in the warehouse with other

commodities."  Pl.'s Reply & Resp. 4, 11 ("Because Schedule B provides a specific pricing formula tied to the quantity of prepositioned goods stored at Jacintoport's facility, the 'size of Jacintoport's warehouse' and 'the percentage of Jacintoport's 550,000 square feet of warehouse space that would be allocated for USAID' are irrelevant.").

The government, on the other hand, argues that $3.00 per metric ton represents an estimated rate "included in the Contract for budgetary purposes" and that "[w]ithout including budgetary line items for certain costs, it would be difficult to estimate the total cost of the Contract."  Def.'s Cross-Mot. & Opp'n 15-16.  The government also notes that, consistent with its interpretation of item 6 in Schedule B, other provisions in the contract state that "fumigation costs . . . shall be billed at cost."  Def.'s Cross-Mot. & Opp'n 15 (quoting Section VI.D of the contract and adding emphasis).

Neither party's proffered interpretation, however, squares with the provision's language, which is internally inconsistent.  Fumigation cannot be billed both "at cost" and at "$3.00 per metric ton" irrespective of its cost.  Nonetheless, the language of item 6 in Schedule B of the contract appears to require as much.  Jacintoport's attempt to reconcile this contradiction by casting "$3.00 per metric ton" as an "agreed-upon cost" is unpersuasive.  If the parties agreed that fumigation would be reimbursed at $3.00 per metric ton regardless of the actual cost, why would they have used the term "at cost" at all, and why would the contract consistently refer to the contractor's entitlement to be paid for the costs of fumigation as "reimbursement," which by definition is a repayment of actual expenses incurred?  See Merriam-Webster, http://www.merriam-webster.com/dictionary/reimburse (last visited May 15, 2015) (defining "reimburse" as "to pay someone an amount of money equal to an amount that person has spent").

The government similarly fails to resolve the contradiction.  It does not explain why a "schedule of rates" would incorporate an estimated cost that the agency used merely for budgetary purposes.

Given that item 6 of Schedule B appears to contradict itself, it is patently ambiguous. Because of its "obvious, gross, and glaring" nature, Jacintoport had a duty to confirm that its understanding of the charges authorized for fumigation reimbursement under the contract was correct and that the language of the contract clearly reflected that understanding.  See NVT Techs., 370 F.3d at 1162.  Therefore, item 6 of Schedule B shall be construed against Jacintoport, and the Court holds that the contract provided for reimbursement of fumigation at actual cost.

## CONCLUSION

In accordance with the foregoing, Jacintoport's motion for judgment on the pleadings is **DENIED**, and the government's cross-motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  In addition, within 30 days of the date of this Order, the parties shall file a joint proposed schedule to govern proceedings going forward, in light of this opinion.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge